## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| CHRISTIAN CASTLE, individually, and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>SUMMIT PATHOLOGY, and SUMMIT PATHOLOGY LABORATORIES, INC.,<br><br>    Defendants. | CIVIL ACTION NO. 1:24-cv-3036<br><br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## PLAINTIFF'S ORIGINAL CLASS ACTION COMPLAINT

Plaintiff Christian Castle ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action complaint against Defendants, Summit Pathology and Summit Pathology Laboratories, Inc. (collectively, "Summit" or "Defendant"). Plaintiff makes the following allegations, except as to allegations specifically pertaining to Plaintiff, upon information and belief based on, among other things, the investigation of counsel and review of public documents.

## NATURE OF THE ACTION

1. Plaintiff brings this class action against Summit for its failure to properly secure and safeguard personally identifiable information ("PII") including, but not limited to, Plaintiffs' names, addresses, dates of birth, Social Security numbers, financial information, medical billing and insurance information, medical diagnoses and other health information ("PHI"), and other sensitive data (collectively, "Private Information" or "PII"). Summit's severe failures have caused—and continue to cause—widespread injuries to Plaintiff and Class Members (the "Data Breach").

2.      Defendant Summit is an independent pathology laboratory serving patients at physicians' offices and hospitals throughout Colorado, Wyoming, and Nebraska.[1]

3.      Plaintiff and Class Members are current and former patients of Summit who, in order to obtain medical pathology services from Summit, were and are required to entrust Summit with their sensitive, non-public Private Information. Summit could not perform its operations or provide its services without collecting Plaintiff's and Class Members' Private Information and retains it for many years, at least, even after the patient-provider relationship has ended.

4.      During its business operations, Summit acquired, collected, utilized, and derived a benefit from Plaintiff's and Class Members' Private Information. Therefore, Summit owed and otherwise assumed statutory, regulatory, and common law duties and obligations, including to keep Plaintiff's and Class Members' Private Information confidential, safe, secure, and protected from the type of unauthorized access, disclosure, and theft that occurred in the Data Breach.

5.      According to Summit's notice to victims of the Data Breach, titled "Notice of Data Breach" ("Notice Letter"), in April 2024 Summit learned of "suspicious activity" within its computer network systems. Summit's ensuing investigation revealed that during the incident, unauthorized actors accessed and obtained files containing patients' Private Information including their names, addresses, dates of birth, Social Security numbers, financial information, medical billing and insurance information, and medical diagnoses, and other sensitive health information.[2]

6.      Plaintiff brings this class action lawsuit on behalf of those similarly situated to address Summit's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide adequate notice to Plaintiff and other Class Members

---

[1] *See* About Our Pathology Services, Summit Pathology,
https://www.summitpathology.com/about/ (last visited Oct. 29, 2024).

[2] *See* Ex. A, Notice Of Data Breach dated October 18, 2024.

2

that their information had been subject to the unauthorized access of an unknown third party and precisely what specific type of information was accessed.

7.      Upon information and belief, Summit maintained the Private Information in a negligent manner. In particular, the Private Information was maintained on computer systems and networks that were in a condition vulnerable to cyberattack. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Summit; and, thus, Summit was on notice that failing to take appropriate protective measures would expose and increase the risk that the Private Information could be compromised and stolen.

8.      Hackers can offer for sale the unencrypted, unredacted Private Information to criminals. The exposed Private Information of Plaintiff and Class Members can, and likely will, be sold repeatedly on the dark web.

9.      Plaintiff and Class Members now face a current and ongoing risk of identity theft, which is heightened here by the loss of Social Security numbers—the gold standard for identity thieves.

10.     This Private Information was compromised due to Summit's negligent and/or careless acts and omissions and the failure to protect the Private Information of Plaintiff and Class Members.

11.     As a result of this data breach, Plaintiff's and Class Members' Private Information has been compromised, and they are, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

12.     While many details of the Data Breach remain in the exclusive control of Summit,

upon information and belief, Summit breached its duties and obligations by failing, in one or more of the following ways: (1) failing to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (2) failing to design, implement, and maintain reasonable data retention policies; (3) failing to adequately train staff on data security; (4) failing to comply with industry-standard data security practices; (5) failing to warn Plaintiff and Class Members of Defendant's inadequate data security practices; (6) failing to encrypt or adequately encrypt the Private Information; (7) failing to recognize or detect that its network had been compromised and accessed in a timely manner to mitigate the harm; (8) failing to utilize widely available software able to detect and prevent this type of attack; and (9) otherwise failing to secure the hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

13.     As a result of Summit's unreasonable and inadequate data security practices that resulted in the Data Breach, Plaintiff and Class Members are at a current and ongoing risk of identity theft and have suffered numerous actual and concrete injuries and damages, including: (a) invasion of privacy; (b) financial "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) financial "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution of value of their Private Information; (i) anxiety, annoyance and nuisance; and (j) the continued risk to their Private Information, which remains in the possession of Summit, and which is subject to further breaches, so long as Summit fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private

Information.

14.     Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose Private Information was accessed during the Data Breach. Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, future costs of identity theft monitoring, and injunctive relief including improvements to Summit's data security systems, and future annual audits.

15.     Accordingly, Plaintiff brings this action against Summit seeking redress for its unlawful conduct, and asserting claims for: (i) negligence, (ii) negligence per se, (iii) breach of implied contract; (iv) invasion of privacy; (v) unjust enrichment; and (vi) declaratory and injunctive relief.

## **PARTIES**

### *Plaintiff Christian Castle*

16.     Plaintiff Christian Castle ("Plaintiff" or "Plaintiff Castle") is and was at all relevant times, a citizen and resident of the State of Colorado and resides in Fort Collins, Colorado. Plaintiff Castle received a letter dated October 18, 2024, from Defendant Summit notifying Plaintiff Castle that Summit's network had been accessed and Plaintiff's Private Information may have been involved in the Data Breach.

17.     As a direct and proximate result of the Data Breach, Plaintiff Castle has made reasonable efforts to mitigate the impact of the Data Breach and the risk of future injury, including, but not limited to: conducting research about the Data Breach; discussing the breach with Plaintiff's family; and reviewing his credit reports and financial account statements for any indication of actual or attempted identity theft or fraud.

18.     Plaintiff Castle values his privacy and is very concerned about identity theft and

the consequences of such theft and fraud resulting from the Data Breach.

19.     Plaintiff Castle suffered actual injury from having Plaintiff's PII and PHI compromised as a result of the Data Breach, including but not limited to (a) damage to and diminution in the value of Plaintiff's PII, a form of property that Summit obtained from Plaintiff; (b) violation of Plaintiff's privacy rights; and (c) present and increased risk arising from the identity theft and fraud.

20.     Plaintiff Castle also lost his benefit of the bargain by paying for medical services that failed to provide the data security that was promised

21.     As a result of the Data Breach, Plaintiff Castle anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. As a result of the Data Breach, Plaintiff is and will continue to be at increased risk of identity theft and fraud for years to come.

***Defendants***

22.     Defendant Summit Pathology is a general partnership organized under Colorado law and with its principal place of business at 5802 Wright Drive, Loveland, Colorado 80538.

23.     Defendant Summit Pathology Laboratories, Inc. is a Colorado corporation with its principal place of business at 5802 Wright Drive, Loveland, Colorado 80538.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because Plaintiff and at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 putative class members, and the amount in controversy exceeds $5 million, exclusive of interest and costs. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

25.     This Court has personal jurisdiction over Defendant because it operates and is headquartered in this District and conducts substantial business in this District.

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. Moreover, Defendant is based in this District, maintains Plaintiff's and Class Members' Private Information in this District, and has caused harm to Plaintiff and Class Members in this District.

## FACTUAL ALLEGATIONS

### *The Data Breach*

27.     Summit is an independent pathology laboratory serving patients at physicians' offices and hospitals throughout Colorado, Wyoming, and Nebraska.[3]

28.     Plaintiff and Class Members are current and former patients of Summit who received medical pathology healthcare services from Summit prior to April 18, 2024.

29.     As a condition and in exchange for receiving healthcare services from Summit, Summit's patients, including Plaintiff and Class Members, were required to entrust Summit with highly sensitive Private Information, including their names, addresses, dates of birth, financial information, Social Security numbers, health insurance and billing information, medical diagnoses, and other sensitive PII and PHI.

30.     Summit is and was required by law to provide the aforementioned Notice of Privacy Practices to all patients receiving healthcare services from Summit; Upon information and belief, Summit provided the Notice of Privacy Practices to Plaintiff and Class Members prior to them entrusting their Private Information to Summit.

---

[3] *See* About Our Pathology Services, Summit Pathology, https://www.summitpathology.com/about/ (last accessed Oct. 29, 2024).

31.     On or about April 18, 2024, Summit became aware that its network may have been breached.

32.     Following a forensic investigation, Summit then discovered that cybercriminals had accessed a set of electronically stored personal information stored on its network, "such as dates of birth, Social Security numbers, and financial information."[4]

33.     According to the Notice of Data Breach available on Summit's website:

> **What Happened**
> Summit Pathology and Summit Pathology Laboratories, Inc. (collectively "Summit") writes to inform you of a recent event that may affect the privacy of certain information related to you. This notice provides information about the event, the response, and resources available offered at no cost to affected individuals to help protect impacted information from possible misuse. This notice was not delayed due to an investigation by law enforcement.
>
> On or around April 18, 2024, Summit identified suspicious activity within our computer environment. We immediately took steps to secure our network and launched an investigation with the assistance of third-party forensic specialists to determine the nature and scope of the activity. Based on this investigation, we identified files within our systems that may have been accessed or acquired by the unauthorized cybercriminal, and the impacted systems contained certain patient data.[5]

34.     Summit's Notice of Data Breach admits that Plaintiff's and Class Members' Private Information was accessed without authorization.[6]

35.     At all relevant times, Summit knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and the foreseeable consequences that would occur if Summit's data security system was breached, including,

---

[4] Ex. A, Notice Of Data Breach dated October 18, 2024; *see also* Summit Pathology, Notice of Data Breach, *available at* https://www.summitpathology.com/notice-of-data-breach/ (last accessed on Oct. 29, 2024).

[5] *Id.*

[6] *Id.*

specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

36.    Indeed, Summit's Notice of Privacy Practices, which covers, applies to, and sets forth obligations regarding the Private Information Summit collects and maintains, warrants and assures patients, "Summit . . . [is] committed to protecting the privacy of your protected health information or PHI," and "required by law to maintain the privacy of your PHI."[7]

37.    Summit's Notice of Privacy Practices further promises patients as follows:

> **How We May Use or Disclose Your Health Information**
> We use your PHI for treatment, payment, or healthcare operations purposes and for other purposes permitted or required by law. Not every use or disclosure is listed in this Notice, but all of our uses or disclosures of your health information will fall into one of the categories listed below. We need your written authorization to use or disclose your health information for any purpose not covered by one of the categories below.[8]

38.    Summit was, or should have been, fully aware of the unique type and the significant volume of data on Summit's network, amounting to potentially millions of individuals' detailed, personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

39.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[9]

40.    Summit's data security obligations were particularly important given the

---

[7] Notice of Privacy Practices, Summit Pathology, *available at* https://www.summitpathology.com/wp-content/uploads/2024/07/Notice-of-Privacy-Practices-Rev-7.2024.pdf (last accessed October 29, 2024).

[8] *Id.*

[9] *See* How to Protect Your Networks from RANSOMWARE, at 3, *available at* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last accessed Oct. 29, 2021).

substantial increase in cyberattacks and/or data breaches in the healthcare industry preceding the date of the breach.

41.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020. Of the 1,862 recorded data breaches, 330 of them, or 17.7% were in the medical or healthcare industry.[10] The 330 reported breaches in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.

42.     In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020), Summit knew or should have known that its electronic records would be targeted by cybercriminals.

43.     Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals… because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[11]

---

[10] *See* 2021 Data Breach Annual Report, 6 (ITRC, Jan. 2022), *available at* https://notified.idtheftcenter.org/s/ (last accessed Oct. 29, 2024).

[11] FBI, Secret Service Warn of Targeted, Law360 (Nov. 18, 2019), *available at* https://www.law360.com/articles/1220974/fbisecret-service-warn-of-targeted-ransomware (last accessed Oct. 29, 2024).

44.     In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks between 2019 and 2020.[12]

45.     Therefore, the increase in such attacks, and the attendant risk of future attacks, was widely known to the public and to anyone in Summit's industry, including Summit.

### Value of PII and PHI

46.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[13] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[14]

47.     The PII of consumers remains of high value to criminals, as evidenced by the prices offered through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[15] According to the Dark Web Price Index for 2021, payment card details for an account balance up to $1,000 have an average market value of $150, credit card details with an account balance up to $5,000 have an average market value of

---

[12] *See* Maria Hernandez, Iowa City Hospital Suffers Phishing Attack, Security Magazine (Nov. 23, 2020), *available at* https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers- phishing-attack (last accessed Oct. 29, 2024).

[13] 17 C.F.R. § 248.201 (2013).

[14] *Id.*

[15] *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends, Oct. 16, 2019, *available at* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed Oct. 29, 2024).

$240, stolen online banking logins with a minimum of $100 on the account have an average market value of $40, and stolen online banking logins with a minimum of $2,000 on the account have an average market value of $120.[16] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[17]

48.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts.

49.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information…[is] worth more than 10x on the black market."[18]

50.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing, or even give false information to police.

51.    The fraudulent activity resulting from the Data Breach may not come to light for years.

52.    Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance

---

[16] *Dark Web Price Index 2021*, Zachary Ignoffo, March 8, 2021, *available at* https://www.privacyaffairs.com/dark-web-price-index-2021/ (last accessed Oct. 29, 2024).

[17] *In the Dark,* VPNOverview, 2019, *available at* https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed Oct. 29, 2024).

[18] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers,* IT World, (Feb. 6, 2015), *available at* https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed Oct. 29, 2024).

and payment records, and credit report may be affected."

53.     There is also a robust legitimate market for the type of sensitive information at issue here. Marketing firms utilize personal information to target potential customers, and an entire economy exists related to the value of personal data.

54.     Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PII and PHI on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

55.     Moreover, there may be a time lag between when harm occurs versus when it is discovered and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[19]

56.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[20]

---

[19] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at* https://www.gao.gov/assets/gao-07-737.pdf (last accessed Oct. 29, 2024).

[20] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed Oct. 29, 2024).

57.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—names, dates of birth, and PHI.

58.     As such, future monitoring of financial and personal records is reasonable and necessary well beyond the one of protection offered by Summit.

### *Summit Failed to Properly Protect Plaintiff's and Class Members' Private Information*

59.     Summit could have prevented this Data Breach by properly securing and encrypting the systems containing the Private Information of Plaintiff and Class Members. Alternatively, Summit could have destroyed the data, especially for individuals with whom it had not had a relationship for a period of time.

60.     Summit's negligence in safeguarding the PII of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to companies like Summit to protect and secure sensitive data they possess.

61.     Despite the prevalence of public announcements of data breach and data security compromises, Summit failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

62.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's

license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[21]

63.    The ramifications of Summit's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

64.    To prevent and detect unauthorized cyber-attacks, Summit could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider

---

[21] *See generally Fighting Identity Theft With the Red Flags Rule: A How-To Guide for Business*, FED. TRADE COMM., *available at* https://www.ftc.gov/business-guidance/resources/fighting-identity-theft-red-flags-rule-how-guide-business (last accessed Oct. 29, 2024).

using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[22]

65.    To prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Summit could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks…

- **Use caution with links and when entering website addresses.** Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g.,.com instead of .net)…

- **Open email attachments with caution.** Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe.** Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders.** If you are unsure whether or not an email is

---

[22] *Id.* at 3-4.

legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself.** Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs.** Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic…[23]

66.    Moreover, given that Summit was storing the PII of Plaintiff and Class Members, Summit could and should have implemented all of the above measures to prevent and detect cyberattacks.

67.    The occurrence of the Data Breach indicates that Summit failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the PII of Plaintiff and Class Members.

68.    As a result of computer systems in need of security upgrades and inadequate procedures for handling email phishing attacks, viruses, malignant computer code, and hacking attacks, Summit negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information.

69.    Because Summit failed to properly protect and safeguard Plaintiff's and Class Members' Private Information, an unauthorized third party was able to access Summit's network, and access Summit's database and system configuration files and exfiltrate that data.

### *Summit Failed to Comply with FTC Guidelines*

---

[23] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at* https://www.cisa.gov/news-events/news/protecting-against-ransomware (last accessed Oct. 29, 2024).

70.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making.

71.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[24]

72.    The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

73.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

74.    The FTC has brought enforcement actions against businesses for failing to

---

[24] Protecting Personal Information: A Guide for Business, Federal Trade Commission (2016), *available at* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last accessed Oct. 29, 2024).

adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions clarify the measures businesses take to meet their data security obligations.

75.    These FTC enforcement actions include actions against healthcare providers like Summit. *See, e.g.*, *In the Matter of LabMd, Inc., A Corp*, 2016-2 Trade Cas. (Defendants) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

76.    Summit failed to properly implement basic data security practices.

77.    Summit's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

78.    Summit was always fully aware of its obligation to protect the Private Information of Plaintiff and Class Members. Summit was also aware of the significant repercussions that would result from its failure to do so.

### Summit Failed to Comply with HIPPA Guidelines

79.    Summit is a covered Business Associate under HIPAA (45 C.F.R. § 160.103) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

80. Accordingly, Summit is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[25] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

81. HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

82. HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

83. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

84. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

85. HIPAA's Security Rule requires Summit to do the following:

   a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

   b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

   c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

   d. Ensure compliance by its workforce.

86. HIPAA also requires Summit to "review and modify the security measures

---

[25] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Summit is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

87.    HIPAA and HITECH also obligated Summit to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

88.    The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Summit to provide notice of the Data Breach to each affected individual "without unreasonable delay and *in no case later than 60 days following discovery of the breach*."[26]

89.    HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

90.    HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

91.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of

---

[26] Breach Notification Rule, U.S. Dep't of Health & Human Servs., *available at* https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added) (last visited Oct. 29, 2024).

Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[27] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[28]

### Summit Failed to Comply with Industry Standards

92.     As shown above, experts studying cyber security routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

93.     Several best practices have been identified that at a minimum should be implemented by healthcare service providers like Summit, including, but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

---

[27] Security Rule Guidance Material, U.S. DEP'T OF HEALTH & HUMAN SERVS., *available at* http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited Oct. 29, 2024).

[28] Guidance on Risk Analysis, U.S. DEP'T OF HEALTH & HUMAN SERVS., *available at* https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited Oct. 29, 2024).

94.     Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

95.     Upon information and belief, Summit failed to comply with one or more of the foregoing industry standards.

### Summit Owed Plaintiff and Class Members a Common Law Duty to Safeguard Their Private Information

96.     In addition to its obligations under federal and state laws, Summit owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Summit's duty owed to Plaintiff and Class Members obligated it to provide reasonable data security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected Plaintiff's and Class Members' Private Information.

97.     Summit owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others who accessed Private Information within its computer systems on how to adequately protect Private Information.

98.     Summit owed a duty to Plaintiff and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

99.     Summit owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

100.     Summit owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

101.     Summit owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

102.     Summit failed to take the necessary precautions required to safeguard and protect Plaintiff's and Class Members' Private Information from unauthorized disclosure. Summit's actions and omissions represent a flagrant disregard of Plaintiff's and Class Members' rights.

### *Summit's Negligent Acts and Breaches*

103.     Summit participated and controlled the process of gathering the Private Information from Plaintiff and Class Members.

104.     Summit therefore assumed and otherwise owed duties and obligations to Plaintiff and Class Members to take reasonable measures to protect the information, including the duty of oversight, training, instruction, testing of the data security policies and network systems. Summit breached these obligations to Plaintiff and Class Members and/or were otherwise negligent because it failed to properly implement data security systems and policies for its health providers network that would adequately safeguarded Plaintiff's and Class Members' Sensitive Information. Upon information and belief, Summit's unlawful conduct included, but is not limited to, one or more of the following acts and/or omissions:

   a)  Failing to design and maintain an adequate data security system to reduce the risk of data breaches and protect Plaintiff's and Class Members Sensitive Information;

   b)  Failing to properly monitor its data security systems for data security vulnerabilities and risk;

   c)  Failing to test and assess the adequacy of its data security system;

   d)  Failing to develop adequate training programs related to the proper handling of

emails and email security practices;

e) Failing to put into develop and place uniform procedures and data security protections for its healthcare network;

f) Failing to adequately fund and allocate resources for the adequate design, operation, maintenance, and updating necessary to meet industry standards for data security protection;

g) Failing to ensure or otherwise require that it was compliant with FTC guidelines for cybersecurity;

h) Failing to ensure or otherwise require that it was adhering to one or more of industry standards for cybersecurity discussed above;

i) Failing to implement or update antivirus and malware protection software in need of security updating;

j) Failing to require encryption or adequate encryption on its data systems;

k) Otherwise negligently and unlawfully failing to safeguard Plaintiff's and Class Members' Private Information provided to Summit, which in turn allowed cyberthieves to access its IT systems.

## COMMON INJURIES & DAMAGES

105.    As result of Summit's ineffective and inadequate data security practices, Plaintiff and Class Members now face a present and ongoing risk of fraud and identity theft.

106.    Due to the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of

benefit of the bargain (price premium damages); (h) diminution of value of their Private Information; and (i) the continued risk to their Private Information, which remains in Summit's possession, and which is subject to further breaches, so long as Summit fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

### *The Risk of Identity Theft to Plaintiff and Class Members Is Present and Ongoing*

107. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

108. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

109. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

110. The dark web is an unindexed layer of the internet that requires special software or

26

authentication to access.[29] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[30] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

111.    The digital character of PII stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[31]

112.    Social Security numbers, for example, are among the worst kinds of personal information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors

---

[29] What Is the Dark Web? Experian, *available at* https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last accessed Oct. 29, 2024).

[30] *Id.*

[31] *Id.*

> demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[32]
>
> What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

113.    Even then, new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[33]

114.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[34]

115.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that

---

[32] Social Security Administration, Identity Theft and Your Social Security Number, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed Oct. 29, 2024).

[33] Brian Naylor, Victims of Social Security Number Theft Find It's Hard to Bounce Back, NPR (Feb. 9, 2015), *available at* https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthems-hackers-has-millions-worrying-about-identity-theft (last visited Oct. 29, 2024).

[34] Social Security Administration, Identity Theft and Your Social Security Number, *available at* https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed Oct. 29, 2024).

year, resulting in more than $3.5 billion in losses to individuals and business victims.[35]

116.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[36] Summit did not rapidly report to Plaintiff and the Class that their Private Information had been stolen.

117.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

118.    In addition to out-of-pocket expenses that can exceed thousands of dollars, and the emotional toll identity theft can take, some victims have to spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

119.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and Class Members will need to remain vigilant against unauthorized data use for years or even decades to come.

120.    The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and

---

[35] *See* FBI News, 2019 Internet Crime Report Released, *available at* https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last accessed October 29, 2024).

[36] *Id.*

amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[37]

121.    The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[38]

122.    According to the FTC, unauthorized PII disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout. The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.[39]

---

[37] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), *available at* http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited Oct. 29, 2024).

[38] *See generally* Protecting Personal Information: A Guide for Business, Federal Trade Commission (2016), *available at* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last accessed Oct. 29, 2024)

[39] *See e.g.,* Prepared Statement of the Federal Trade Commission on Privacy in the Digital Age: Preventing Data Breaches and Combating Cybercrime, *available at* https://www.ftc.gov/system/files/documents/public_statements/prepared-statement-federal-trade-commission-privacy-digital-age-preventing-data-breaches-combating/140204datasecuritycybercrime.pdf (last accessed Oct. 29, 2024).

123.    Summit's failure to properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

### *Loss of Time to Mitigate the Risk of Identity Theft and Fraud*

124.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the resource and asset of time has been lost.

125.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity—which may take years to discover and detect—and filing police reports.

126.    Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office, who released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[40]

---

[40] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf (last accessed Oct.

127.    Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[41]

128.    A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[42]



129.    In the event that Plaintiff and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial

---

29, 2024).

[41]    *See* Federal Trade Commission, IdentityTheft.gov, *available at* https://www.identitytheft.gov/Steps (last visited Oct. 29, 2024).

[42]    Jason Steele, Credit Card and ID Theft Statistics, *available at* https://www.creditcards.com/statistics/credit-card-security-id-theft-fraud-statistics-1276/ (last visited Oct. 29, 2024).

costs and time to repair the damage to their good name and credit record."[43] Indeed, the FTC recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[44]

### Diminution of Value of the Private Information

130.    PII is a valuable property right.[45] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

131.    For example, drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PII/PHI on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves.

132.    Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[46]

---

[43] *See* GAO, Personal Information Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, at 2 (June 2007), *available at* https://www.gao.gov/new.items/d07737.pdf  (last visited Oct. 29, 2024) ("GAO Report").

[44] *See* Federal Trade Commission, IdentityTheft.gov, *available at* https://www.identitytheft.gov/Steps (last visited Oct. 29, 2024).

[45] *See*, e.g., John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[46] *See* Ashiq Ja, Hackers Selling Healthcare Data in the Black Market, InfoSec (July 27, 2015),

133.    Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, medical data was selling on the dark web for $50 and up.[47]

134.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and potential release onto the Dark Web, where it may soon be available and holds significant value for the threat actors.

135.    To date, Summit has done little to provide Plaintiff and Class Members with relief for the damages they have suffered as a result of the Data Breach—Summit has offered one year— or 24 months depending on state of residence—of inadequate identity monitoring services through IDX—despite Plaintiff and Class Members being at risk of identity theft and fraud for the foreseeable future. Summit has not offered any other relief or protection.

136.    The one year of credit monitoring offered to persons whose Private Information was compromised is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud. Summit also places the burden squarely on Plaintiff and Class Members by requiring them to expend time signing up for that service, as opposed to automatically enrolling all victims of this Data Breach.

137.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the modus operandi of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black

---

*available at* https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last Oct. 29, 2024).

[47]    Ransomware attacks paralyze, and sometimes crush, hospitals, *available at* https://news.sophos.com/en-us/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/ (last Oct. 29, 2024).

market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

138.    It must be noted there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO Report, at p. 29.

139.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

140.    Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[48] The information

---

[48] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web*, New Report Finds, FORBES (Mar. 25, 2020), *available at* https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/ (last accessed Oct. 29, 2024).

disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

141.    Consequently, Plaintiff and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

142.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Summit's Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Summit's failure to safeguard their Private Information.

### *Injunctive Relief Is Necessary to Protect Against Future Data Breaches*

143.    Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Summit, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

## CLASS ACTION ALLEGATIONS

144.    Plaintiff brings this nationwide class action on behalf of himself and on behalf of others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

145.    The Nationwide Class that Plaintiff seeks to represent is defined as follows:

All individuals residing in the United States whose Private Information may have been compromised in the Data Breach, including all persons who received a Notice Letter (the "Class").

146.    Excluded from the Class are Summit's officers and directors, and any entity in

which Summit has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Summit. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

147.    Plaintiff reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

148.    <u>Numerosity</u>, Fed. R. Civ. P. 23(a)(1): Class Members are so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, according to the report submitted to the U.S. Department of Health and Human Services Office for Civil Rights, the Class consists of at least thousands of persons whose data was compromised in Data Breach.[49]

149.    <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

  a.  Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

  b.  Whether Defendant had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

  c.  Whether Defendant had duties not to use the Private Information of Plaintiff and Class Members for non-business purposes;

  d.  Whether Defendant failed to adequately safeguard the Private Information of Plaintiff and Class Members;

  e.  Whether and when Defendant actually learned of the Data Breach;

  f.  Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

  g.  Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

---

[49]    Breach Portal, U.S. Dept of Health and Hum. Servs., https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited Oct. 29, 2024).

h.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.  Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.  Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

k.  Whether Defendant violated the consumer protection statutes invoked herein;

l.  Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

m.  Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

n.  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

150.  <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of the Data Breach, due to Summit's misfeasance.

151.  <u>Predominance</u>. Summit has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Summit's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy. Summit's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Summit's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

152.  <u>Adequacy of Representation</u>, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no

disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

153.    <u>Superiority</u>, Fed. R. Civ. P. 23(b)(3): Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Summit. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

154.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Summit would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action

alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

155.    The litigation of the claims brought herein is manageable. Summit's uniform conduct, uniform methods of data collection, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

156.    Adequate notice can be given to Class Members directly using information maintained in Summit's records.

157.    Unless a Class-wide injunction is issued, Summit may continue in its failure to properly secure the Private Information of Class Members, Summit may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Summit may continue to act unlawfully as set forth in this Complaint.

158.    Further, Summit has acted or refused to act on grounds generally applicable to the Class and, accordingly, class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

159.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.    Whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    b.    Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    c.    Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data

security;

d.   Whether an implied contract existed between Defendant on the one hand, and Plaintiff and Class Members on the other, and the terms of that implied contract;

e.   Whether Defendant breached the implied contract;

f.   Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

g.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h.   Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members; and

i.   Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE/NEGLIGENCE PER SE
#### (On Behalf of Plaintiff and the Class)

160.   Plaintiff re-alleges and incorporates by reference paragraphs 1 through 159 above as if fully set forth herein.

161.   Defendant required Plaintiff and Class Members to submit private, confidential Private Information to Defendant as a condition of receiving healthcare services from Defendant.

162.   Plaintiff and Class Members provided certain Private Information to Defendant including their names, social security numbers, dates of birth, addresses, healthcare insurance and billing information, financial information, medical diagnosis and treatment information, and other sensitive information.

163.   Defendant had full knowledge of the sensitivity of the Private Information to which it was entrusted, and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information was wrongfully disclosed to unauthorized persons. Defendant had a duty

to Plaintiff and each Class Member to exercise reasonable care in holding, safeguarding, and protecting their Private Information.

164.    Plaintiff and Class Members were the foreseeable victims of any inadequate safety and security practices by Defendant.

165.    Plaintiff and the Class Members had no ability to protect their Private Information in Defendant's possession.

166.    By collecting and storing Plaintiff's and Class Members' Private Information in its network systems, Defendant had a duty of care to use reasonable means to secure and safeguard it, to prevent disclosure of the information, and to safeguard the Private Information from theft. Defendant's duty included a responsibility to implement processes by which it could detect if that Private Information was exposed to unauthorized actors and to give prompt notice to those affected in the case of a data breach.

167.    Defendant owed a duty to Plaintiff and the Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

168.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its patients, which is recognized by laws and regulations including but not limited to the FTC Act and HIPAA, as well as by the common law. Defendant was able to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a cybersecurity event like this Data Breach, whereas Plaintiff and Class Members were not.

169.    Defendant's duty also arose from its position as a healthcare provider. Defendant

holds itself out as a trusted provider of outpatient medical services, and thereby assumes a duty to reasonably protect its patients' Private Information. Indeed, Defendant, as a healthcare provider, was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members due to the Data Breach.

170.    Defendant had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

171.    Pursuant to the FTC Act, 15 U.S.C. § 45, Defendant had a duty to provide adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

172.    Pursuant to HIPAA, 42 U.S.C. § 1302d et seq., Defendant had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

173.    Pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." See 45 C.F.R. § 164.304.

174.    Additionally, pursuant to HIPAA, Defendant had a duty to provide notice of the Data Breach within 60 days of discovering it. See 42 C.F.R. § 2.16(b); 45 C.F.R. § 164.404(b).

175.    Defendant breached its duties to Plaintiff and Class Members under the FTC Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information, by failing to encrypt or

timely delete the Private Information from its network systems, and by failing to provide notice to Plaintiff and Class Members of the Data Breach until over 60 days after Defendant discovered it.

176.    Defendant's violation of the statutes described herein directly caused and/or were a substantial factor in the Data Breach and resulting injuries to Plaintiff and Class Members.

177.    Plaintiff and Class Members are within the class of persons the FTC Act and HIPAA were intended to protect.

178.    The type of harm that resulted from the Data Breach was the type of harm the FTC Act and HIPAA were intended to guard against.

179.    Defendant's failure to comply with the FTC Act and HIPAA constitutes negligence per se.

180.    Defendant's duty to use reasonable care in protecting Plaintiff's and Class Members' Private Information in its possession arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to secure such Private Information.

181.    Defendant breached its duties and was negligent by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Private Information;

    b.  Failing to adequately train employees on proper cybersecurity protocols;

    c.  Failing to adequately monitor the security of its networks and systems;

    d.  Failure to periodically ensure that its network system had plans in place to maintain reasonable data security safeguards;

    e.  Allowing unauthorized access to Plaintiff's and Class Members' Private Information; and

      f.   Failing to timely notify Plaintiff and Class Members about the Data Breach so they could take appropriate steps to mitigate their damages.

182.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, the Data Breach would not have occurred or at least would have been mitigated, Plaintiff's and Class Members' Private Information would not have been compromised, and Plaintiffs and Class Members' injuries would have been avoided.

183.    It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiff's and Class Members' Private Information would injure Plaintiff and Class Members. Further, the breach of security was reasonably foreseeable to Defendant given the known high frequency of cyber-attacks and data breaches in the healthcare industry.

184.    It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' Private Information would cause them one or more types of injuries.

185.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer injuries and damages, including but not limited to (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) actual identity theft and fraud; (d) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (e) loss of benefit of the bargain; and (f) the continued and certainly increased risk to their Private Information, which (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) remains in Defendant's possession and subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect it.

186.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will continue to suffer other forms of injuries and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-

economic losses.

187.    Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

188.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

189.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 159 above as if fully set forth herein.

190.    This claim is pleaded in the alternative to the claim for breach of implied contract.

191.    Plaintiff and Class Members conferred a direct benefit on Defendant by way of providing payment and their confidential and sensitive Private Information to Defendant as part of Defendant's business.

192.    Defendant required Plaintiff's and Class Members' Private Information to conduct its business and generate revenue, which it could not do without collecting and maintaining Plaintiff's and Class Members' Private Information.

193.    The monies Plaintiff and Class Members paid to Defendant included a premium for Defendant's cybersecurity obligations and were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing reasonable data security and protection for Plaintiff's and Class Members' Private Information.

194.    Defendant benefitted from collecting and using Plaintiff's and Class Members' Private Information, using it to generate revenue and market its services.

195.     Defendant enriched itself by hoarding the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant calculated to increase its own profit at the expense of Plaintiff and Class Members by utilizing cheap, ineffective security measures and diverting those funds to its own personal use. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

196.     Defendant failed to provide reasonable security, safeguards, and protections to the Private Information of Plaintiff and Class Members, and as a result, Defendant was overpaid.

197.     Under principles of equity and good conscience, Defendant should not be permitted to retain the money Plaintiff and Class Members paid it because Defendant failed to provide adequate safeguards and security measures to protect Plaintiff's and Class Members' Private Information, which Plaintiff and Class Members paid for but did not receive.

198.     Defendant wrongfully accepted and retained these benefits—payment and Plaintiff's and Class Members' Private Information—and was enriched to the detriment of Plaintiff and Class Members.

199.     Defendant's enrichment at Plaintiff's and Class Members' expense is unjust.

200.      As a result of Defendant's wrongful conduct and resulting unjust enrichment, Plaintiff and Class Members are entitled to restitution and disgorgement of profits, benefits, and other compensation obtained by Defendant, plus reasonable attorneys' fees and costs.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and Class Members, requests judgment

against Defendant and that the Court grant the following:

A.  For an Order certifying the Class, and appointing Plaintiff and her Counsel to represent the Class;

B.  For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiff and Class Members;

C.  For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i.  prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii.  requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii.  requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.  requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

v.  prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vi.  requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.  requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix. requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x. requiring Defendant to conduct regular database scanning and securing checks;

xi. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii. requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual

basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.      For an award of damages, including, but not limited to, actual, consequential, and nominal damages, as allowed by law in an amount to be determined;

E.      For an award of attorneys' fees, costs, and litigation expenses as allowed by law;

F.      For prejudgment interest on all amounts awarded; and

G.      Such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands that this matter be tried before a jury.

Date: Oct. 30, 2024                     Respectfully Submitted,


s/Kelly Hyman
Kelly Hyman, CO. Bar # 51813
THE HYMAN LAW FIRM, PA
515 North Flagler Drive, Suite 350
West Palm Beach, FL 33401 Telephone:
561.538.9050
kellyhyman@thehymanlawfirm.com



Linda P. Nussbaum, Esq.
**NUSSBAUM LAW GROUP, P.C.**
1133 Avenue of the Americas, 31st Floor
New York, NY 10036
Tel: (917) 438-9189
lnussbaum@nussbaumpc.com

*Attorneys for the Plaintiff and the Putative Class*